```
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
UNITED STATES OF AMERICA,       )     Case No. 2:10CR00386 DS
            Plaintiff,          )
      vs.                       )
                                )
MARTIN MANCILLA-FLORES and      )     MEMORANDUM DECISION
CARLOS PEREZ-LOPEZ              )     AND ORDER ADDRESSING
                                      MOTION TO SUPPRESS
            Defendant.          )     EVIDENCE
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

## I. INTRODUCTION

Defendant Martin Mancilla-Flores has moved to suppress evidence obtained from, or as a result of, the traffic stop performed on April 29, 2010, on the Mercury Cougar he was driving. Defendant Carlos Perez-Lopez, who was a passenger in the vehicle, also moves to suppress and joins Mancilla-Flores in the pleadings. An evidentiary hearing was held followed by post trial briefing.

The material facts are not in dispute. On April 29, 2010, DEA agents were conducting an investigation of Milton Borjas and had arranged to buy drugs from him on that date. Borjas, who was being followed by agents, was observed entering La Macarena Restaurant at about 1:30 or 2:00 that same afternoon. Agents also observed a white Volkswagen Jetta arrive at the parking lot and a male wearing a tan jacket and white t-shirt exit the Jetta and enter the restaurant.

1

Agent Schoonmaker ran the Jetta's license plate number and learned that it was registered to Juan Jose Urias-Leal at 1451 Veronica Way in Salt Lake. Later that day agents learned that Urias-Leal was an alias used by Sergio Beltran-Negrete, who was arrested that same afternoon for participating with Borjas in delivering two pounds of methamphetamine to an undercover agent. The Toyota Corolla that Beltran-Negrete was driving to deliver the methamphetamine was registered at the same address on Veronica Way as the Jetta. Agents determined that Beltran-Negrete was the individual in the tan jacket and white t-shirt who was seen exiting the Jetta earlier at La Macarena Restaurant.

Also observed by agents entering La Macarena Restaurant on April 29, 2010, while Borjas and Beltran-Negrete were inside, was a Hispanic male with short hair and a stocky build wearing a yellow collared shirt and blue jeans. This man, Borjas, and the man who arrived in the Jetta and was later identified as Beltran-Negrete, all exited the restaurant within two minutes of one another.

Later that day Borjas and Beltran-Negrete were arrested attempting to sell two pounds of methamphetamine to an undercover officer. Beltran-Negrete stated that he, Borjas, and his partner named "Chayo", had all met at the La Macarena Restaurant earlier in the day to discuss getting two pounds of methamphetamine for Borjas to sell. Beltran-Negrete further stated that he met

2

"Chayo" in West Valley after they left the restaurant and that "Chayo" gave him the Toyota Corolla loaded with the methamphetamine and a gun. "Chayo" in turn kept the white Jetta.

"Chayo" was described by Beltran-Negrete as a Hispanic male with short hair, stocky build who was wearing a yellow shirt and blue jeans that day. All agents were informed that the supplier of the two pounds of methamphetamine seized was likely still driving the white Jetta with a specific license plate number.

Later that night, agents located the white Jetta parked in the driveway of 7951 West Athena Drive in Magna, Utah, where they observed two Hispanic males exit the residence and enter a red Mercury Cougar parked in front of the house. One of the men had a short stocky build, was wearing a yellow shirt and blue jeans, and generally matched the description of "Chayo". He was later identified as Defendant Mancilla-Flores. The other man was later identified as Defendant Perez-Lopez.

Agents followed the Cougar away from the residence, and directed Unified Police Officers in a marked patrol car to make a stop of the vehicle. DEA Agent Midgley, identified the driver, later identified as Defendant Mancilla-Flores, as the same man he had seen entering and exiting La Macarena Restaurant the same afternoon when Borjas and Beltran-Negrete were also observed.

## II. DISCUSSION

**A. Legality of Stop/Arrest.**

Mr. Mancilla-Flores' position is that the stop of the vehicle he was driving was "a post-investigative stop for the predetermined purpose of executing his arrest", Def.['s] Mem. Supp. at 2, for which probable cause is required. He urges that his arrest was made without probable cause. The United States asserts that the stop was justified as an investigative stop based on reasonable suspicion, "[b]ut even assuming that probable cause was required, the information that officers had in this case reached the level of probable cause." Pl.['s] Supp. Resp. at 1.[1] It is un-controverted that officers had reasonable suspicion to stop the vehicle.

**1. Probable Cause - Arrest**

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *see also Cortez v. McCauley*, 478 F.3d 1108, 1116 (10th Cir.2007) ("[p]robable cause is based on the totality of the circumstances, and requires reasonable trustworthy information that would lead a reasonable

---

[1] At the evidentiary hearing the United States asserted that "[t]he stop of the vehicle containing these two defendants was based on probable cause of drug trafficking and was not a separate traffic violation for which the stop was made," Tr. at 4-5.

officer to believe that the person about to be arrested has committed or is about to commit a crime"). "'Probable cause to arrest does not require facts sufficient to establish guilt, but does require more than mere suspicion.'" *United States v. Munoz-Nova*, 524 F.3d 1137, 1144 (10th Cir. 2008)(citation omitted).

The Court agrees with the United States that officers had sufficient information to establish probable cause. The Court adopts the following statement of facts and analysis as set forth by the United States.

> Officers observed a man closely matching Mancilla-Flores' description attend a meeting earlier that same day with two individuals who were arrested after the meeting with two pounds of methamphetamine. Those two arrested individuals were separately interviewed and described [Chayo who was later identified as] Mancilla-Flores as the guy who supplied the two pounds of methamphetamine that were seized by law enforcement. One of the arrested individuals also informed officers that the supplier of the methamphetamine was in possession of a white Volkswagen Jetta with a specific plate number. That Jetta was found at the house from which Mancilla-Flores was observed leaving immediately prior to the stop of his vehicle. Based on the methamphetamine seized earlier in the day, the observation of Mancilla-Flores at the meeting with the arrestees before their arrest, the detailed statements of the two arrestees implicating [Chayo who was later identified as] Mancilla-Flores in the earlier drug transaction, and the finding of the Jetta in close proximity to Mancilla-Flores, probable cause existed to stop the Mancilla- Flores vehicle to arrest him for his involvement in drug trafficking.

Pl.['s] Supp. Resp. at 1-2.

### 2. **Collective Knowledge Doctrine**

Defendant Mancilla-Flores urges that the evidence fails to

satisfy the collective knowledge doctrine because the court is "left to speculate about whether G.S. Hardman knew anything about the evidence that had been collected throughout the day, whether he had a sufficient discussion with Detective Birky, and whether Detectives Zizumbo and Jarvis had any knowledge whatsoever." Def.['s] Mem. Supp. at 8.

The parties agree that this case implicates the vertical category of the "fellow officer rule", also known as the "collective knowledge doctrine". The doctrine applies to "a situation where one officer has probable cause and instructs another officer to act, but does not communicate the corpus of information known to the first officer that would justify the action." *United States v. Chavez*, 534 F.3d 1338,1345 (10th Cir. 2008)[2], *cert. denied*, 129 S. Ct. 953 (2009). In such a situation

---

[2]Favorably citing other cases, the *Chavez* court further stated:
> Extrapolating from *Hensley*, those circuits that have addressed squarely the issue presented here have held that a police officer may rely on the instructions of the DEA (or other law enforcement agencies) in stopping a car, even if that officer himself or herself is not privy to all the facts amounting to probable cause. *See United States v. Ramirez*, 473 F.3d 1026, 1037 (9th cir. 2007)("Where one officer knows facts constituting reasonable suspicion or probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer may conduct a warrantless stop, search or arrest without violating the Fourth Amendment"); *United States v. Williams*, 429 F.3d 767, 771-72 (8th Cir. 2005)("[W]e also hold that the collective knowledge of the DEA team was sufficient to provide reasonable suspicion to stop [the co-defendant's]

6

the DEA task force's knowledge of which they had reasonably trustworthy information may be imputed to other officers to permit the other officers to make an arrest. *Id*. at 1348.

Agent Holmer testified that DEA Group Supervisor Rich Hardman was present and made the decision to pull over Defendants' vehicle. Tr. at 81. Agent Schoonmaker testified that"[t]he overall decision on whether there was probable cause was with the case agent and the group supervisor, and it was their decision and their estimation on the probable cause." Tr. at 22. Contrary to Defendants' assertion, based on the available testimony the clear implication is that Group Supervisor Hardman was present, involved in the investigation, and, indeed, he was tasked with making the decision as to whether the evidence provided sufficient probable cause to stop Defendants' vehicle. Supervisor Hardman asked Detective Birky, an assisting officer with the Unified Police Department, to have her officers pull over the vehicle. Tr. at 81-82. Moreover, as the government notes, "DEA Agent Holmer, who had knowledge of the prior investigation, was immediately present at the stop and assumed

<div style="margin-left: 2em;">

vehicle, and such knowledge was imputed to the officer at the scene when he received [another officer's] radioed request."); *United States v. Burton*, 288 F. 3d 91, 99 (3d Cir. 2002)("[T]he arresting officer need not possess an encyclopedic knowledge of the facts supporting probable cause, but can instead rely on an instruction to arrest delivered by other officers possessing probable cause.").

</div>

Chavez, 534 F.3d at 1347.

7

command of Mancilla-Flores in place of the stopping officers. So there was no risk of an unlawful stop based on faulty information being supplied to the actual stopping officers [who] ... were used merely for officer safety, as their vehicle was equipped with police lights and sirens whereas the DEA vehicles were not." Pl.['s] Supp. Resp. *See* Tr. at 83-85.

The Court finds that Unified Police Officers acted properly on the strength of the DEA's probable cause when Defendants' vehicle was stopped.

### III.  CONCLUSION

For the reasons stated, as well as generally for those set forth by the United States in its pleadings, the Motions to Suppress of both Defendant Mancilla-Flores and Defendant Perez-Lopez (Doc. #30 and Doc. #33 ) are denied.

IT IS SO ORDERED.

Dated this 25th day of January, 2011.

BY THE COURT:

_____
DAVID SAM
SENIOR JUDGE
UNITED STATES DISTRICT COURT